UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**FRANK SUESS (a.k.a., FRANZ P. SUESS)**<br>**LUIS SALGADO,**<br>**MELISSA DRISCOLL,**<br>**VICTOR VELAZCO,**<br>**WARREN PIZIK,**<br>**DAVE SINGH,**<br>**DIANA CASTRO,**<br><br>Defendants. | : | CR. NO. 3:24-CR-00308<br><br>(Judge Mannion)<br><br>FILED<br>HARRISBURG, PA<br>NOV 13 2024<br>PER IBR<br>DEPUTY CLERK |

# INDICTMENT

THE GRAND JURY CHARGES:

At times material to this Indictment:

## COUNT 1
18 U.S.C. § 1349
(Conspiracy to Commit Health Care Fraud)

## BACKGROUND

1. Defendant FRANK SUESS (a.k.a., "FRANZ P. SUESS") was a resident of Wellington, Florida.

2. FRANK SUESS controlled various companies, including Wellington Rx Inc., Coast to Coast Pharmacy Inc ("CTC Pharmacy"), Medivalue Florida LLC, and Pharma Supply Inc. Each of these companies was located in or around an office building located at 3361 Fairlane Farms Rd, Wellington, Florida, which FRANK SUESS owned and from which he conducted business.

3. Defendant LUIS SALGADO was the CEO of MedX Marketing Solutions ("MedX"), an LLC based in or around Naperville, Illinois. MedX was a closely held company controlled by LUIS SALGADO.

4. LUIS SALGADO was also the owner of Five Star Rx Pharmacy, located in or around Davie, Florida.

5. Sterling Pharmacy was located in or around Jermyn, Pennsylvania, in the Middle District of Pennsylvania.

6. MELISSA DRISCOLL was a resident of East Stroudsburg, Pennsylvania, in the Middle District of Pennsylvania. On or about March 1, 2018, MELISSA DRISCOLL became the nominal owner of Sterling Pharmacy.

7. FLORIDA PHARMACY was a pharmacy located in or around Riviera Beach, Florida. On paper, FLORIDA PHARMACY was controlled by FLORIDA PHARMACIST, an associate of FRANK SUESS.

8. TEXAS PHARMACY was a pharmacy located in or around Spring, Texas.

9. Defendant VICTOR VELAZCO was a Vice President at Wellington Rx and a Vice President at CTC Pharmacy. VICTOR VELAZCO reported to FRANK SUESS, who was the President of CTC Pharmacy. VICTOR VELAZCO conducted business using a Wellington Rx email account.

10. Defendant WARREN PIZIK was affiliated with Family Physicians Rx Inc. ("FPRX"), which was located in or around Davie, Florida, and was an associate of LUIS SALGADO. WARREN PIZIK was a resident of the Miami-Fort Lauderdale area.

11. Defendant DAVE SINGH was an associate of LUIS SALGADO who worked for Five Star Rx Pharmacy and was a resident of the Miami-Fort Lauderdale area.

12. Defendant DIANA CASTRO was a podiatrist and a resident of Brooklyn, New York. As a health care provider, DIANA CASTRO had the ability to prescribe medications. DIANA CASTRO also had a unique ten-digit identifier known as a National Provider Identifier (NPI). This way, any services billed under her name or medications prescribed by her could be traced back to her.

13. RECRUITER 1 was a resident of the Middle District of Pennsylvania.

14. RECRUITER 2 and RECRUITER 3 were residents of New Jersey.

15. RECRUITER 4 was a resident of New York.

16. ATTORNEY 1 was an attorney specializing in health care matters and was based in or around New Jersey.

*Health Care Benefit Programs*

17. A "health care benefit program" was defined as "any public or private plan to contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service

for which payment may be made under the plan or contract." In this case, the Medicare Program fell under the definition of a "health care benefit program."

18. The Medicare Program ("Medicare") was a federally funded health care program generally providing benefits to people aged 65 or older, younger people with disabilities, and people with end stage renal disease. Medicare was administered by the Centers for Medicare & Medicaid Services (CMS), a federal agency within the Department of Health and Human Services (HHS). Individuals who received Medicare benefits were referred to as Medicare "beneficiaries."

19. Physicians, clinics, and other health care providers, including pharmacies and laboratories (collectively, "providers"), that provided services to beneficiaries and members, could enroll with health care benefit programs, including Medicare or private health insurance plans, and provide medical services to beneficiaries and members. Providers were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with

Medicare to obtain reimbursement for benefits, items, or services provided to beneficiaries.

20. Health care providers could only submit claims to Medicare for reasonable and medically necessary services that they rendered. Medicare regulations also required health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician. Medicare required complete and accurate patient medical records so that Medicare could verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, through SafeGuard Services LLC and other contractors that perform watchdog services for the Medicare program, to review the appropriateness of Medicare payments made to the health care provider.

21. Medicare had four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug

benefits (Part D). Medicare Part B helped to pay the cost of medically necessary physician office services, medical equipment and supplies, and other health services and supplies not paid by Part A. Medicare Part D provided coverage for the cost of prescription drugs for individuals on Medicare.

22. By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers were given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

23. To receive Medicare reimbursement, providers were required to have a written provider agreement. The Medicare provider

enrollment application, CMS Form 855B, was required to be signed by an authorized representative of a provider. CMS Form 855B contained a certification stating:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

24. In executing CMS Form 855B, providers further certified that they would "not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and would "not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

25. Beneficiaries could receive prescription drug benefits through Medicare Part D by enrolling in a Medicare drug plan. Medicare Part D drug plans were operated by private health care insurance companies approved by Medicare and referred to as drug plan "sponsors." A beneficiary in a Medicare drug plan could have a prescription filled at a

pharmacy and use his or her plan to pay for some or all of the prescription.

26. CMS compensated Medicare sponsors for providing prescription drug benefits to beneficiaries. CMS paid Medicare sponsors a monthly capitation fee for each beneficiary enrolled in a Medicare sponsor's plan. In addition, in some cases where a Medicare sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's capitation fee, CMS reimbursed the Medicare sponsor for a portion of those additional expenses.

27. Typically, Medicare, like private plans, did not process beneficiaries' prescription claims directly. Instead, Medicare's drug plans were administered by Pharmacy Benefit Managers (PBMs), whose responsibilities included adjudicating and processing payment for prescription drug claims submitted by eligible pharmacies. PBMs also audited participating pharmacies to ensure compliance with their rules and regulations.

28. Several PBMs accounted for a large percentage of the prescriptions that were adjudicated and processed throughout the

United States. They were CVS Caremark, Express Scripts, and Optum Rx.

29. A pharmacy could participate in the Part D program by entering into a provider agreement with a Part D drug plan or with a PBM. Pharmacies entered into contractual agreements with PBMs either directly or indirectly. If indirectly, providers first contracted with pharmacy network groups, which then contracted with PBMs on behalf of providers. By contracting with drug plans or PBMs, directly or indirectly, pharmacies agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

30. Upon receiving prescriptions, pharmacies submitted claims to Medicare, to private plans, or to PBMs for dispensing prescription drugs. Medicare, private plans, and PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

31. Under the Social Security Act, Medicare covered Part D drugs dispensed upon a valid prescription and for a "medically accepted indication." Medicare generally did not cover drugs meant for

prevention of disease and only covered drugs meant to treat an existing illness or injury.

32. To prevent fraud, waste, and abuse, Medicare, private plans, and PBMs required providers, including pharmacies, to collect copayments from beneficiaries and members prior to or soon after the service or item was provided. They also specified that copayments could not be systematically waived or reduced. Consistent copayment collection was a fraud prevention measure, as copayments give beneficiaries and members financial incentives to reject medications that are not medically necessary or have little or no value to a beneficiary's treatment.

33. UNION BENEFIT FUND was a fund providing a range of benefits to active and retired health care industry workers who were members of a large health care workers' union and their family members. The benefits included healthcare coverage with little to no

out-of-pocket cost to many members. UNION BENEFIT FUND was a "health care benefit program," as that term was defined above.

34. Like Medicare, UNION BENEFIT FUND only paid for health care claims based on reasonable and medically necessary services that were actually rendered.

35. To be reimbursed for prescription medications, pharmacies submitted claims to insurance companies identifying each drug or drug ingredient dispensed, including each drug's National Drug Code ("NDC") number.

*Foot Baths*

36. Health care benefit programs or PBMs typically reimbursed pharmacies the Average Wholesale Price ("AWP") of each drug ingredient dispensed, minus any negotiated discount. AWP referred to the average price at which drugs or drug ingredients were sold at the wholesale level. Drugs or drug ingredients with NDC numbers that were reimbursed at high rates were called "high-adjudication."

37. From about 2019 until about 2020, providers sometimes prescribed high-adjudication antibiotic and antifungal drugs ("high-

adjudication foot bath medications") along with a plastic foot tub and instructed the recipient—often a beneficiary with whom the provider had no preexisting relationship—to compound the drugs at home by mixing them with warm water in order to soak their feet.

38. These high-adjudication foot bath medications were purportedly prescribed to treat a variety of fungal, bacterial, or other types of foot infections, despite not being medically accepted for those purposes. These foot bath drugs routinely included vancomycin capsules, tobramycin vials, calcipotriene cream, moxifloxacin eye drops, clindamycin phosphate solution, ketoconazole cream, and other expensive drugs.

39. When properly prescribed, tobramycin vials were used by licensed and trained healthcare providers to administer injections of antibiotic solutions to treat various bacterial infections.

40. When properly prescribed, vancomycin capsules were administered to patients to treat particular conditions, including

methicillin-resistant *Staphylococcus aureus* (MRSA) and Clostridioides difficile (*C. Diff*)-associated diarrhea.

41. When properly prescribed, moxifloxacin eye drops were administered to patients to treat bacterial conjunctivitis, commonly known as "pink eye."

42. When properly prescribed, calcipotriene cream was typically used to treat plaque psoriasis of the skin and scalp.

43. When properly prescribed, clindamycin phosphate solution was typically used to treat acne.

44. Thus, with foot baths, patients were prescribed and dispensed oral capsules with the supposed expectation that they would break open the capsules and add them to a foot-bath solution, rather than ingesting them orally. Patients were also prescribed and dispensed injectable solutions with the supposed expectation that they would add them to a foot-bath solution rather than injecting them. Patients were prescribed and dispensed eye drops with the supposed expectation that they would add them to a foot-bath solution, rather than using them as eye drops.

The use of these medications in a foot bath was not an approved route of administration.

45. Some of these medications were also known to have potentially severe and permanent side effects, including hearing or balance loss and kidney damage. In addition, tobramycin and vancomycin have well known drug interactions and should generally not be taken together without appropriate supervision by a medical provider.

46. Typically, the drugs used in foot baths did not previously require preauthorization from Medicare before being prescribed. Additionally, the majority of these drugs were not previously subject to utilization management, meaning that there was no limit on the quantity of drugs that could be ordered in a single prescription. As a result, providers who prescribed such foot bath drugs often did so in large volumes, and pharmacies that filled those prescriptions likewise filled and mailed large volumes of such drugs to recipients within a short period of time.

## STATUTORY ALLEGATION

47. Paragraphs 1 through 46 are incorporated here.

48. From about 2019 until about 2020, in Lackawanna County, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**FRANK SUESS,**
**LUIS SALGADO,**
**MELISSA DRISCOLL,**
**VICTOR VELAZCO,**
**WARREN PIZIK,**
**DAVE SINGH, and**
**DIANA CASTRO,**

did knowingly combine, conspire, confederate, and agree, with persons both known and unknown to the Grand Jury, to commit offenses against the United States and to defraud the United States, that is: To knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicare and UNION BENEFIT FUND, health care benefit programs as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, Medicare and UNION BENEFIT

FUND, in connection with the payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

MANNER AND MEANS OF THE CONSPIRACY

49. FRANK SUESS and VICTOR VELAZCO used nominee owners to acquire control of independent pharmacies in various geographic locations in order to conceal their own involvement in the business affairs of those pharmacies. FRANK SUESS and VICTOR VELAZCO then used those pharmacies to generate profits by steering high-cost prescription drug mail orders to those pharmacies. When the pharmacies were then investigated for those prescribing practices, FRANK SUESS, VICTOR VELAZCO, and their nominee owners, including MELISSA DRISCOLL, used various tactics to conceal FRANK SUESS and VICTOR VELAZCO's use of those pharmacies to carry out fraud.

50. FRANK SUESS and VICTOR VELAZCO acquired control of various pharmacies using nominee owners so that they could continue generating profit from prescription drugs even if one pharmacy was

suspended or terminated due to violations of law or the terms governing its relationships with PBMs.

51. FRANK SUESS and VICTOR VELAZCO entered into relationships with marketers, including LUIS SALGADO, whose responsibility was to identify beneficiaries whose insurance providers could be billed for high-cost prescription drugs. By pairing beneficiaries with specific pharmacies with which they had established relationships, FRANK SUESS, VICTOR VELAZCO, and LUIS SALGADO were able to reap the financial benefits from foot baths.

52. On or about March 8, 2018, Express Scripts, one of the large PBMs, notified CTC Pharmacy, which FRANK SUESS controlled, that it would be terminated "for cause" for failure to adhere to the terms of the Express Scripts Provider Agreement. The reasons for termination included that CTC Pharmacy was "dispensing Covered Medications in violation of any applicable law, rule and/or regulation." This termination would thus prevent CTC Pharmacy from any future participation in the Express Scripts network, including prohibiting payment for prescription drugs.

53. On or about March 1, 2018, MELISSA DRISCOLL became, on paper, the owner of Sterling Pharmacy. Per the terms of a stock purchase agreement, MELISSA DRISCOLL agreed to pay the prior owner approximately $250,000 for Sterling Pharmacy.

54. FRANK SUESS provided to MELISSA DRISCOLL the funds to purchase Sterling Pharmacy. On or about February 6, 2018, FRANK SUESS, using Medivalue Florida LLC, sent a wire transfer of approximately $15,000 as a deposit to purchase the pharmacy. On or about February 27, 2018, FRANK SUESS, using Medivalue Florida LLC, sent a wire transfer of approximately $235,000 for the closing of the transaction the following day. On or about March 2, 2018, FRANK SUESS, using Medivalue Florida LLC, sent a wire transfer in the amount of approximately $100,000 to provide MELISSA DRISCOLL with the funds that she needed to run the pharmacy.

55. After MELISSA DRISCOLL became the nominal owner of Sterling Pharmacy, she completed various applications and updates so that the pharmacy could do business with other companies, including PBMs and drug suppliers. In these documents, MELISSA DRISCOLL

concealed her, FRANK SUESS, and VICTOR VELAZCO's plans to use Sterling Pharmacy to conduct substantial mail-order business.

56. On or about February 21, 2019, Express Scripts notified FLORIDA PHARMACY, which FRANK SUESS controlled through a different nominee owner, that it would be terminated "for cause" for failure to adhere to the terms of the Express Scripts Provider Agreement. The reasons for termination included that FLORIDA PHARMACY was "dispensing Covered Medications in violation of any applicable law, rule and/or regulation" and "breache[d] . . . its representations and warranties" in the Provider Agreement. This termination would thus prevent FLORIDA PHARMACY from any future participation in the Express Scripts network, including prohibiting payment for prescription drugs.

57. In or about August 2019, VICTOR VELAZCO, who reported to FRANK SUESS, and MELISSA DRISCOLL, who purchased Sterling Pharmacy with FRANK SUESS's assistance, communicated about starting up Sterling Pharmacy's business of dispensing and shipping foot baths via mail. On or about August 29, 2019, VICTOR VELAZCO,

sent an email to MELISSA DRISCOLL attaching "instructions to include in the shipment when we get our first foot bath patients." On or about the same date, VICTOR VELAZCO sent an email to MELISSA DRISCOLL containing an attachment showing a list of foot bath medications, the cost to purchase the medications, and the amounts that they would be paid when dispensing the medications.

58. In or about September 2019 and October 2019, FRANK SUESS, VICTOR VELAZCO, LUIS SALGADO, WARREN PIZIK, and DAVE SINGH communicated about the marketing of foot baths and the generation of beneficiaries. On or about September 10, 2019, VICTOR VELAZCO provided to WARREN PIZIK, FRANK SUESS, and DAVE SINGH "the information for the PA pharmacy" and included the name, address, and toll-free phone and fax numbers for Sterling Pharmacy. VICTOR VELAZCO instructed WARREN PIZIK to coordinate with an employee of Wellington Rx on the "workflow." WARREN PIZIK then shared the same information with LUIS SALGADO.

59. FRANK SUESS, VICTOR VELAZCO, and LUIS SALGADO met on one or more occasions in Florida, including on or about October

1, 2019. Among other things, they discussed the potential purchase of patient leads, or contact information for patients who could become customers. In emails leading up to their October 2019 meeting, FRANK SUESS, VICTOR VELAZCO, and LUIS SALGADO discussed "net final profit reports for STERLING (PA) and [FLORIDA PHARMACY]," the division of profits on a percentage basis, and how expenses like shipping costs would be handled.

60. WARREN PIZIK and DAVE SINGH assisted LUIS SALGADO with marketing Sterling Pharmacy's mail-order pharmacy business. On or about October 17, 2019, DAVE SINGH emailed to WARREN PIZIK a promotional flyer advertising the pharmacy's services, including "text and email refill reminders," "free local delivery," and "skin solutions," among other things. WARREN PIZIK then forwarded the same flyer to LUIS SALGADO.

61. LUIS SALGADO, through MedX, entered into agreements with recruiters who were paid to identify and refer beneficiaries to whom foot baths would be prescribed. These recruiters were not medical providers. These recruiters used templated prescription order forms

provided to them by LUIS SALGADO and routed those order forms to medical providers for approval.

62. LUIS SALGADO entered into a relationship with RECRUITER 1, a resident of the Middle District of Pennsylvania who worked as a diabetic shoe salesman at a shopping mall located in or around Scranton, Pennsylvania. LUIS SALGADO agreed to pay RECRUITER 1 to find beneficiaries to whom foot baths could be prescribed. LUIS SALGADO, through MedX, provided to RECRUITER 1 templated prescription drug order forms, which RECRUITER 1 completed and sent to beneficiaries' medical providers for their signature. These signed order forms were ultimately transmitted to pharmacies, including Sterling Pharmacy, to be filled.

63. LUIS SALGADO paid RECRUITER 1 a flat monthly fee for patient recruitment, but RECRUITER 1 negotiated his fees based on the number of beneficiaries for which he secured foot bath prescriptions.

64. RECRUITER 1 told beneficiaries—who were often elderly or required special footwear, such as orthopedic or diabetic shoes—that foot bath drug treatments would be helpful to them. Beneficiaries then

received by mail delivery a plastic tub for soaking their feet along with multiple prescriptions drugs and instructions for how to create a foot bath. These drug deliveries occurred even though no physician had spoken to those beneficiaries, examined their feet, or provided any type of medical diagnosis. Furthermore, the beneficiaries often did not make any copayment to the dispensing pharmacies for these drugs.

65. Beneficiaries' prescriptions, once signed by a provider, were regularly routed to pharmacies controlled by FRANK SUESS and VICTOR VELAZCO, including Sterling Pharmacy, FLORIDA PHARMACY, and TEXAS PHARMACY, for purposes of billing and fulfilment.

66. From about 2019 until about 2020, these pharmacies billed insurance providers for large amounts of foot bath prescription drugs, which in some cases they mailed to beneficiaries in or around the Middle District of Pennsylvania and across the country. The filling of these prescriptions caused the beneficiaries' insurance providers to be billed for these drugs, despite the drugs' lack of medical acceptance for this purpose and lack of medical necessity.

67. FRANK SUESS, VICTOR VELAZCO, LUIS SALGADO, WARREN PIZIK, and DAVE SINGH exchanged emails about which pharmacies to use for foot bath prescriptions at different times. On or about October 18, 2019, VICTOR VELAZCO sent an email to DAVE SINGH and WARREN PIZIK, copying FRANK SUESS, listing the pharmacies that they controlled and the states where they could do business. VELAZCO listed Sterling Pharmacy as a "top choice" since it had "insurances." WARREN PIZIK then forwarded the same information to LUIS SALGADO.

68. WARREN PIZIK and DAVE SINGH conducted and shared research regarding applications for pharmacy licenses in additional states. On or about October 28, 2019, DAVE SINGH sent an email to WARREN PIZIK containing information on applications for "non-resident pharmacies" in Oklahoma, which WARREN PIZIK then forwarded to FRANK SUESS and VICTOR VELAZCO, copying LUIS SALGADO. WARREN PIZIK wrote that "time [was] of the essence."

69. LUIS SALGADO continued to search for other ways to identify beneficiaries to whom to prescribe foot baths. On or about October 29,

2019, LUIS SALGADO sent an email containing "foot bath info" to RECRUITER 3. RECRUITER 3 in turn forwarded this information a number of different contacts, including DIANA CASTRO.

70. On or about November 5, 2019, LUIS SALGADO sent an email to VICTOR VELAZCO, FRANK SUESS, and WARREN PIZIK asking for their approval of templated prescription order forms that could be used to prescribe foot bath medications to beneficiaries located in New York. These templated forms were for large quantities of each medication—including 180 vancomycin 250mg capsules—and for three refills of each medication.

71. On or about November 12, 2019, VICTOR VELAZCO sent an email to LUIS SALGADO, DAVE SINGH, and WARREN PIZIK, copying FRANK SUESS, noting that they were "already seeing audits" for footbath claims.

72. FRANK SUESS and VICTOR VELAZCO, along with other representatives of Wellington Rx, provided reports to LUIS SALGADO and WARREN PIZIK regarding the foot bath orders for which they were sharing profits. On or about November 22, 2019, a representative of

Wellington Rx sent a spreadsheet titled "FPRX DAILY REPORT" listing various foot bath medications prescribed to different beneficiaries located in Florida, Pennsylvania, New York, and Wisconsin. All of the foot bath orders from the November 22, 2019 report were handled by Sterling Pharmacy, FLORIDA PHARMACY, or TEXAS PHARMACY.

73. LUIS SALGADO and RECRUITER 2 formed a relationship in or about November 2019. On or about November 2, 2019, WARREN PIZIK sent LUIS SALGADO a draft employment agreement in which RECRUITER 2 was designated as MedX's "VP of East Coast Sales." The draft agreement contemplated that RECRUITER 2 would be paid zero annual salary and would instead be compensated with commission payments.

74. RECRUITER 2, RECRUITER 3, and RECRUITER 4 organized and attended "health fairs" in or around New York, New York that were primarily intended for beneficiaries of UNION BENEFIT FUND. At these health fairs, union members were prescribed various drugs and services that lacked medical necessity, including foot baths. DIANA

CASTRO attended multiple health fairs, where she was paid for her participation in cash.

75. As a result of health fairs and associated patient recruitment activity in New York, Sterling Pharmacy received hundreds of foot-bath prescription order forms approved by DIANA CASTRO.

76. On or about December 12, 2019, FRANK SUESS, VICTOR VELAZCO, LUIS SALGADO, WARREN PIZIK, and DAVE SINGH had an email exchange in which it was stated that Wellington Rx was receiving foot-bath prescriptions missing prescribing doctor information and that DIANA CASTRO was sending foot-bath prescriptions for patients without maintaining any patient information.

77. A signature stamp was created for DIANA CASTRO so that she did not have to sign individual templated prescription order forms for foot baths by hand. This stamp contained DIANA CASTRO's printed name and an NPI for a medical provider with a name similar to DIANA CASTRO. As a result, each time a foot bath order was processed using one of DIANA CASTRO's stamped forms, the intended billing was

fraudulently associated with a different medical provider who had nothing to do with the foot bath scheme.

78. The use of this medical provider's NPI, without the provider's knowledge, led to hundreds of foot bath claims billed and paid out under that provider's NPI between about December 2019 and the middle of 2020. The total amount paid by UNION BENEFIT FUND for these claims, which lacked medical necessity, was approximately $685,000.

79. Through New York health fairs, Sterling Pharmacy also received foot-bath prescription order forms that appeared to be approved by S.W., a provider who was a Doctor of Psychology (Psy.D.) and therefore not approved to prescribe medications of any kind, let alone treatments for foot conditions.

80. In late December 2019, FRANK SUESS, VICTOR VELAZCO, LUIS SALGADO, WARREN PIZIK, and DAVE SINGH held one or more conference calls to discuss foot baths.

81. On or about January 7, 2020, VICTOR VELAZCO sent an email to FRANK SUESS, LUIS SALGADO, WARREN PIZIK, and DAVE SINGH discussing the idea of creating different combinations of

foot-bath drugs based on the insurance provider. VICTOR VELAZCO attached a spreadsheet showing the amount of profit associated with different foot bath medications. Moxifloxacin eye drops, vancomycin capsules, tobramycin vials, and ketoconazole cream were associated with some of the highest expected profit figures.

82. In response, FRANK SUESS, VICTOR VELAZCO, LUIS SALGADO, WARREN PIZIK, and DAVE SINGH discussed the team of patient recruiters operating in and around New York, New York. LUIS SALGADO said that he met with his "New York fish and they wanted to know what other products we have. They are ready to get us anything we have. Let's make another script pad with new items plus the foot bath." LUIS SALGADO added that "the New York team assured us minimum of 500 per month."

83. Similarly, on or about January 9, 2020, LUIS SALGADO referred to RECRUITER 3 by name and described RECRUITER 3 as "my rep in New York."

84. From on or about January 6, 2020 until on or about February 18, 2020, LUIS SALGADO, through MedX, made four separate bank

transfers to a company controlled by RECRUITER 2 and RECRUITER 2's son, each in the amount of $25,000. These payments were for RECRUITER 2's generation of foot bath prescription orders at New York health fairs.

85. LUIS SALGADO, through Five Star Pharmacy, made approximately five payments to RECRUITER 1 from about 2019 until about 2020.

86. In or about early January 2020, FRANK SUESS, VICTOR VELAZQUEZ, LUIS SALGADO, WARREN PIZIK, and DAVE SINGH exchanged a series of emails relating to patient complaints, which followed soon after shipments of foot baths began. One of the complaining patients was P.B., a member of UNION BENEFIT FUND.

87. The patient complaints included not wanting foot baths, not knowing DIANA CASTRO or having ever seen a foot doctor, having their insurance "charged a lot of money," being "freaked out" because there were no instructions regarding what to do with the medications, and being "scared of the box" of foot baths because it contained "such a huge amount of meds." LUIS SALGADO responded to the group that

while some patients would "freak out" when they saw the amounts charged to their insurance and want the charges reversed, the group should not "make it a big deal" and just reverse the charges because they would get "hundreds of hundreds of patients" and their "reps" would "replace any patients that drop." FRANK SUESS replied only to LUIS SALGADO to state his agreement with this approach.

88. On or about January 31, 2020, MELISSA DRISCOLL, using a Sterling Pharmacy email address, sent an email to VICTOR VELAZCO and other representatives of Wellington Rx stating that Sterling Pharmacy had received "another" reversal request from an insurance provider. MELISSA DRISCOLL wrote, "These insurance companies hate foot baths." FRANK SUESS then forwarded this email chain to LUIS SALGADO, WARREN PIZIK, and DAVE SINGH. FRANK SUESS included a July 2019 advisory from the provider explaining that foot bath orders were being "prescribed and dispensed for dosage strengths and routes of administration that are not consistent with manufacturer prescribing information." LUIS SALGADO replied that

they should "just stay away from that" insurance company because they did not have many patients with that insurance.

89. FRANK SUESS, VICTOR VELAZCO, LUIS SALGADO, WARREN PIZIK, DAVE SINGH, and MELISSA DRISCOLL continued processing orders for foot baths even after these and other indications that foot baths were unapproved and that beneficiaries did not want them. On or about March 2, 2020, VICTOR VELAZCO informed FRANK SUESS, LUIS SALGADO, WARREN PIZIK, and DAVE SINGH that Express Scripts was immediately withholding all further payment from Sterling Pharmacy. VICTOR VELAZCO wrote that they would "not be able to continue on this venture at Sterling, nor [TEXAS PHARMACY]."

90. On or about April 1, 2020, VICTOR VELAZCO urged MELISSA DRISCOLL to catch up on the work in her "queue" because "[w]e need everything we can get now."

91. In response to March 2020 investigative requests from Express Scripts to Sterling Pharmacy, MELISSA DRISCOLL caused to be submitted a letter describing Sterling Pharmacy's "standard operating

procedures with respect to validating a patient-prescriber relationship." Among other things, the letter represented that Sterling Pharmacy conducted various direct discussions with both patient and provider to determine the validity of a prescription before delivering medications to the patient. MESLISSA DRISCOLL caused this letter to be submitted knowing that it misrepresented Sterling Pharmacy's practices with respect to foot bath prescriptions.

92. On or about April 30, 2020, Express Scripts notified Sterling Pharmacy that it would be terminated "for cause" for several reasons, including that Sterling Pharmacy submitted "a fraudulent prescription drug claim or any information in support thereof" and that Sterling Pharmacy was "dispensing Covered Medications in violation of any applicable law, rule and/or regulation."

93. FRANK SUESS, VICTOR VELAZCO, LUIS SALGADO, WARREN PIZIK, and DAVE SINGH continued their efforts to process additional foot bath prescription drug orders despite their network of pharmacies being terminated by PBMs and other insurance providers. On or about May 4, 2020, VICTOR VELAZCO wrote to the others that

they had "received some new scripts" and had identified a new pharmacy in New York that could "service all insurances." VICTOR VELAZCO noted, however, that the pharmacist was "strict" and insisted that they adhere to certain processes for signatures. In response, FRANK SUESS wrote, "Throw the bitch in the Hudson River."

94. On or about May 6, 2020, VICTOR VELAZCO again brought up billing for foot baths through TEXAS PHARMACY. On or about September 18, 2020, Express Scripts terminated TEXAS PHARMACY "for cause" for several reasons, including that TEXAS PHARMACY submitted "a fraudulent prescription drug claim or any information in support thereof."

95. Sterling Pharmacy continued to operate even after the Express Scripts termination. In or about May 2021, OptumRx, another large PBM, informed MELISSA DRISCOLL that it would be immediately removed from participating in the benefit plan for another large insurance provider.

96. LUIS SALGADO sought out additional pharmacies to use for foot bath orders even after the pharmacies discussed above were no longer available. In or around mid-2020, LUIS SALGADO utilized another pharmacy located in or around Ocala, Florida for foot bath orders. After that, several beneficiaries whose foot bath prescription drug orders were previously handled by Sterling Pharmacy in early 2020 then had orders for foot baths billed to their insurance providers in or about July 2020. These beneficiaries included W.E. of New York.

97. W.E. was a beneficiary whose insurance was billed for foot baths based on prescriptions signed by DIANA CASTRO and purportedly filled by STERLING PHARMACY in or about January 2020 and February 2020. In or about July 2020, W.E. was then billed for additional foot bath medications through the pharmacy located in or around Ocala, Florida.

98. W.E.'s Medicare prescription drug plan, Express Scripts Medicare, paid approximately $13,094 for approximately nine total insurance claims related to foot baths.

99. From on or about September 30, 2019 until on or about January 2, 2020, S.V., then a 74-year-old resident of Scranton, PA, received approximately four shipments of foot bath drugs including ketoconazole 2% topical cream, vancomycin oral capsules, and moxifloxacin eye drops, along with a Conair Foot Spa. S.V. was unable to communicate well due to a series of strokes, and S.V. did not utilize these prescription drugs because S.V. and S.V.'s family members did not know what to do with them.

100. When S.V. saw RECRUITER 1 earlier that year to be fitted for a new pair of diabetic shoes, RECRUITER 1 asked to receive and did receive a copy of S.V.'s Medicare insurance plan member card. RECRUITER 1 used S.V.'s insurance information to complete the templated order form for S.V.'s primary physician's signature.

101. S.V.'s Medicare prescription drug plan, SilverScript® Choice by Aetna, paid approximately $15,476.24 for the four shipments of foot bath prescription drugs, which were associated with approximately 12 total insurance claims.

102. From about September 2019 to about February 2020, Sterling Pharmacy mailed to D.F. shipments of medications, which included, among other things, ketoconazole 2% topical cream, vancomycin oral capsules, and moxifloxacin eye drops. Sterling Pharmacy made these shipments about every 30 days, resulting in about 20 insurance claims paid by D.F.'s PBM, Express Scripts. The total amount paid for these claims was approximately $21,632.77. RECRUITER 1 gave kickbacks in the form of gift cards and cash to D.F., a beneficiary residing in or around Scranton, PA so that D.F. would accept more foot bath prescription drugs.

103. M.C., a member of UNION BENEFIT FUND, attended a health fair in New York. In or around early 2020, M.C. received her first shipment of foot baths. M.C. subsequently became overwhelmed by the amount of prescription drugs being shipped to her and called Sterling Pharmacy to cancel future orders. Her shipments included vancomycin capsules, tobramycin vials, diclofenac gel, and econazole cream. M.C. was pressured to continue the orders. M.C. was told that her condition

would worsen without the medications and that she would not be able to get the medications again if she canceled.

104. M.C.'s prescription drug plan, UNION BENEFIT FUND, paid approximately $8,542.04 for shipments of foot bath prescription drugs, which were associated with approximately eight total insurance claims.

105. P.B., a member of UNION BENEFIT FUND who called in or about January 2020 to complain about foot baths, attended a health fair in New York. At the health fair, P.B. was seen by a male individual but did not know what type of medical provider he was. P.B. was asked about a foot treatment, but P.B. did not want her health insurance to be charged. She nevertheless received a shipment of foot baths.

106. P.B.'s prescription drug plan, UNION BENEFIT FUND, paid approximately $4,271.04 for foot bath prescription drugs, which were associated with approximately four total insurance claims.

107. The filling of these foot bath prescription drugs caused large increases in Part D payments to the pharmacies that were part of the foot-bath scheme.

108. Sterling Pharmacy was paid nearly $2.2 million in Medicare Part D payments in 2019, which was more than twice what it had received in 2018. This growth was driven significantly by foot-bath-related therapeutic classes. For instance, payments to Sterling Pharmacy for the anti-infective ophthalmic class, which included prescription eye drops, increased from approximately $272 in 2018 to approximately $75 thousand in 2019. In addition, payments to Sterling Pharmacy for antibacterial agents, which included vancomycin capsules and tobramycin vials, increased from approximately $2,000 in 2018 to approximately $72 thousand in 2019. This trend continued for the first several months of 2020 until Sterling Pharmacy could no longer continue processing orders for foot baths.

109. The attempted billing associated with these medications was even greater than the amounts paid by insurance providers. For instance, a one-month order of tobramycin vials for P.B. was billed to UNION BENEFIT FUND in the amount of $43,209.99, and a one-month order of vancomycin capsules for P.B. was billed to UNION BENEFIT FUND in the amount of $12,476.54.

All in violation of Title 18, United States Code, Section 1349.

THE GRAND JURY FURTHER CHARGES:

**COUNTS 2 – 11**
18 U.S.C. § 1347
(Health Care Fraud)

110. Paragraphs 1 through 46 and 49 through 109 are incorporated here.

111. On or about the dates specified below, in Lackawanna County, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**FRANK SUESS,**
**LUIS SALGADO,**
**MELISSA DRISCOLL,**
**VICTOR VELAZCO,**
**WARREN PIZIK,**
**DAVE SINGH, and**
**DIANA CASTRO,**

aiding and abetting one other and others known and unknown to the Grand Jury, knowingly and willfully did execute and attempt to execute a scheme and artifice to defraud Medicare and UNION BENEFIT FUND, health care benefit programs as defined in Title 18, United

States Code, Section 24(b), their sponsors, and various private plans, and to obtain, by means of false or fraudulent pretenses, representations, and promises, any of the money and property owned by, and under the custody or control of those health care benefit programs, their sponsors, and various private plans, in connection with the delivery and payment for health care benefits, items, and services, with each prescription drug claim below forming a separate count:

| Count | On or About | Beneficiary | Program / Sponsor / Plan | Drug Dispensed | Approximate Amount Paid |
|---|---|---|---|---|---|
| 2 | 12/13/2019 | M.C. | Express Scripts UNION BENEFIT FUND | TOBRAMYCIN 1.2 GM VIAL | $2,940.00 |
| 3 | 12/13/2019 | M.C. | Express Scripts UNION BENEFIT FUND | VANCOMYCIN HCL 250 MG CAPSULE | $1,165.66 |
| 4 | 12/16/2019 | P.B. | Express Scripts UNION BENEFIT FUND | TOBRAMYCIN 1.2 GM VIAL | $2,940.00 |
| 5 | 12/16/2019 | P.B. | Express Scripts UNION BENEFIT FUND | VANCOMYCIN HCL 250 MG CAPSULE | $1,165.66 |
| 6 | 1/9/2020 | W.E. | Express Scripts Medicare | TOBRAMYCIN 1.2 GM VIAL | $2,940.05 |
| 7 | 1/9/2020 | W.E. | Express Scripts Medicare | VANCOMYCIN HCL 250 MG CAPSULE | $1,833.85 |
| 8 | 1/17/2020 | M.C. | Express Scripts UNION BENEFIT FUND | TOBRAMYCIN 1.2 GM VIAL | $2,940.00 |
| 9 | 1/17/2020 | M.C. | Express Scripts UNION BENEFIT FUND | VANCOMYCIN HCL 250 MG CAPSULE | $1,165.66 |
| 10 | 2/18/2020 | W.E. | Express Scripts Medicare | TOBRAMYCIN 1.2 GM VIAL | $2,940.05 |
| 11 | 2/18/2020 | W.E. | Express Scripts Medicare | VANCOMYCIN HCL 250 MG CAPSULE | $1,833.85 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

THE GRAND JURY FURTHER CHARGES:

**COUNTS 12 – 21**
18 U.S.C. § 1347
(Health Care Fraud)

112. Paragraphs 1 through 46 and 49 through 109 are incorporated here.

113. On or about the dates specified below, in Lackawanna County, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**FRANK SUESS,**
**LUIS SALGADO,**
**MELISSA DRISCOLL,**
**VICTOR VELAZCO,**
**WARREN PIZIK, and**
**DAVE SINGH,**

aiding and abetting one other and others known and unknown to the Grand Jury, knowingly and willfully did execute and attempt to execute a scheme and artifice to defraud Medicare, a health care benefit program as defined in Title 18, United States Code, Section 24(b), its sponsors, and various private plans, and to obtain, by means of false or fraudulent pretenses, representations, and promises, any of the money and property owned by, and under the custody or control of this health

care benefit program, its sponsors, and various private plans, in connection with the delivery and payment for health care benefits, items, and services, with each prescription drug claim below forming a separate count:

| Count | On or About | Beneficiary | Program / Sponsor / Plan | Drug Dispensed | Approximate Amount Paid |
|---|---|---|---|---|---|
| 12 | 12/2/2019 | S.V. | Aetna SilverScript® Choice | MOXIFLOXACIN 0.5% EYE DROPS | $2,008.60 |
| 13 | 12/2/2019 | S.V. | Aetna SilverScript® Choice | VANCOMYCIN HCL 250 MG CAPSULE | $2,078.16 |
| 14 | 12/3/2019 | D.F. | Express Scripts Medicare | MOXIFLOXACIN 0.5% EYE DROPS | $2,275.86 |
| 15 | 12/3/2019 | D.F. | Express Scripts Medicare | VANCOMYCIN HCL 250 MG CAPSULE | $1,833.85 |
| 16 | 12/31/2019 | D.F. | Express Scripts Medicare | MOXIFLOXACIN 0.5% EYE DROPS | $2,275.86 |
| 17 | 12/31/2019 | D.F. | Express Scripts Medicare | VANCOMYCIN HCL 250 MG CAPSULE | $1,833.85 |
| 18 | 1/2/2020 | S.V. | Aetna SilverScript® Choice | MOXIFLOXACIN 0.5% EYE DROPS | $2,008.70 |
| 19 | 1/2/2020 | S.V. | Aetna SilverScript® Choice | VANCOMYCIN HCL 250 MG CAPSULE | $1,009.62 |
| 20 | 2/12/2020 | D.F. | Express Scripts Medicare | MOXIFLOXACIN 0.5% EYE DROPS | $1,137.96 |
| 21 | 2/12/2020 | D.F. | Express Scripts Medicare | VANCOMYCIN HCL 250 MG CAPSULE | $1,833.85 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

**COUNT 22**
18 U.S.C. § 371
(Conspiracy to Violate the Anti-Kickback Statute)

114. Paragraphs 1 through 46 and 49 through 109 are incorporated here.

115. From about 2019 until about 2022, in Lackawanna County, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**FRANK SUESS,**
**VICTOR VELAZCO**
**LUIS SALGADO,**
**WARREN PIZIK and**
**MELISSA DRISCOLL,**

did knowingly combine, conspire, confederate, and agree, with persons both known and unknown to the Grand Jury, to commit offenses against the United States and to defraud the United States, that is: To knowingly and willfully solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and in

return for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare, in violation of Title 42, United States Code, Section 1320a-7b(b)(1); and

To knowingly and willfully offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person and to induce such person, to refer individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare, in violation of Title 42, United States Code, Section 1320a-7b(b)(2).

116. From about 2019 until about 2020, MELISSA DRISCOLL, through Sterling Pharmacy, paid to LUIS SALGADO, through MedX, approximately $312,192.28 in kickbacks disguised as payments for

marketing services.

117. From about 2019 until about 2020, MELISSA DRISCOLL, through Sterling Pharmacy, paid to WARREN PIZIK approximately $22,000 in kickbacks disguised as payments for marketing services.

118. MELISSA DRISCOLL, using the email address sterlingpharmacyinc@yahoo.com, received email confirmations from Sterling Pharmacy's bank each time that a kickback payment was made. For example, on or about January 29, 2020, MELISSA DRISCOLL received an email showing that $83,750.56 was credited to MedX via an ACH electronic transfer from Sterling Pharmacy's bank account located in or around the Middle District of Pennsylvania.

119. FRANK SUESS, VICTOR VELAZCO, WARREN PIZIK, and LUIS SALGADO communicated about the fact that the payments from Sterling Pharmacy to MedX and WARREN PIZIK were actually driven by FRANK SUESS and VICTOR VELAZCO. On or about January 14, 2022, VICTOR VELAZCO, copying FRANK SUESS, sent an email to LUIS SALGADO and WARREN PIZIK referencing "the payments we made." VICTOR VELAZCO attached check details showing the

payments made between October 2019 and July 2020 to MedX and WARREN PIZIK. The payments to WARREN PIZIK were also described as related to "Medex."

120. In 2019 and 2020, MedX received kickback payments from various pharmacies, including Sterling Pharmacy, FLORIDA PHARMACY, and TEXAS PHARMACY, totaling more than $1.5 million.

121. From on or about October 15, 2019 until on or about July 31, 2020, the approximate time period of the relationship between MedX and Sterling Pharmacy, LUIS SALGADO, transferred to himself from MedX approximately $488,912.11. LUIS SALGADO used MedX proceeds to pay for various personal expenses, including credit card bills, vehicles, jewelry, and cosmetic surgery. LUIS SALGADO also utilized MedX proceeds to purchase a condominium located in or around Naperville, IL.

122. From about November 2018 to about April 2021, MELISSA DRISCOLL, through Sterling Pharmacy, made a series of large, round payments to FRANK SUESS, through Medivalue, to compensate him

for the money used to purchase and provide working capital for Sterling Pharmacy.

123. From about March 2018 until about October 2021, MELISSA DRISCOLL, through Sterling Pharmacy, made a series of kickback payments to FRANK SUESS and VICTOR VELAZCO, through Wellington Rx, totaling approximately $926,453.33.

124. From about May 2018 until about September 2021, MELISSA DRISCOLL, through Sterling Pharmacy, made a series of kickback payments to FRANK SUESS and VICTOR VELAZCO, through CTC Pharmacy, totaling approximately $100,974.34.

All in violation of Title 18, United States Code, Section 371.

THE GRAND JURY FURTHER CHARGES:

**COUNTS 23 – 38**
42 U.S.C. §§ 1320a-7b(b)(1) – (2)
(Violation of the Anti-Kickback Statute)

125. Paragraphs 1 through 46, 49 through 109, and 116 through 124 are incorporated here.

126. On or about the dates specified below, in Lackawanna

County, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**FRANK SUESS,**
**VICTOR VELAZCO,**
**LUIS SALGADO,**
**WARREN PIZIK and**
**MELISSA DRISCOLL,**

aiding and abetting one other and others known and unknown to the Grand Jury, did willfully and knowingly solicit and receive remuneration and did offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is Medicare and its sponsors; and in return for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare and its sponsors, as set forth below:

| Count | On or About | Description | Approximate Amount |
|---|---|---|---|
| 23 | 11/15/2019 | Payment from Sterling Pharmacy to MedX | $19,412.96 |
| 24 | 12/05/2019 | Payment from Sterling Pharmacy to MedX | $5,112.94 |
| 25 | 12/12/2019 | Payment from Sterling Pharmacy to MedX | $11,852.38 |
| 26 | 01/06/2020 | Payment from Sterling Pharmacy to MedX | $36,812.28 |
| 27 | 01/07/2020 | Payment from Sterling Pharmacy to MedX | $10,847.21 |
| 28 | 01/16/2020 | Payment from Sterling Pharmacy to MedX | $25,288.73 |
| 29 | 01/17/2020 | Payment from Sterling Pharmacy to MedX | $30,000.00 |
| 30 | 01/21/2020 | Payment from Sterling Pharmacy to MedX | $26,171.06 |
| 31 | 01/30/2020 | Payment from Sterling Pharmacy to MedX | $83,750.56 |
| 32 | 01/31/2020 | Payment from Sterling Pharmacy to MedX | $15,358.31 |
| 33 | 02/14/2020 | Payment from Sterling Pharmacy to MedX | $10,000.00 |
| 34 | 02/20/2020 | Payment from Sterling Pharmacy to MedX | $19,730.63 |
| 35 | 03/02/2020 | Payment from Sterling Pharmacy to MedX | $10,242.80 |
| 36 | 4/13/2020 | Payment from Sterling Pharmacy to WARREN PIZIK | $10,000.00 |
| 37 | 4/23/2020 | Payment from Sterling Pharmacy to WARREN PIZIK | $10,000.00 |
| 38 | 7/10/2020 | Payment from Sterling Pharmacy to WARREN PIZIK | $2,000.00 |

All in violation of Title 42, United States Code, Sections 1320a-7b(b)(1) – (2) and Title 18, United States Code, Section 2.

THE GRAND JURY FURTHER CHARGES:

**COUNTS 39 – 51**
42 U.S.C. §§ 1320a-7b(b)(1) – (2)
(Violation of the Anti-Kickback Statute)

127. Paragraphs 1 through 46, 49 through 109, and 116 through 124 are incorporated here.

128. On or about the dates specified below, in Lackawanna County, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**FRANK SUESS,**
**VICTOR VELAZCO and**
**MELISSA DRISCOLL,**

aiding and abetting one other and others known and unknown to the Grand Jury, did willfully and knowingly solicit and receive remuneration and did offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing

and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is Medicare and its sponsors; and in return for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare and its sponsors, as set forth below:

(Continued on following page)

| Count | On or About | Description | Approximate Amount |
|---|---|---|---|
| 39 | 11/22/2019 | Payment from Sterling Pharmacy to Wellington Rx | $5,003.08 |
| 40 | 12/13/2019 | Payment from Sterling Pharmacy to Wellington Rx | $7,702.00 |
| 41 | 01/07/2020 | Payment from Sterling Pharmacy to Wellington Rx | $8,051.17 |
| 42 | 01/15/2020 | Payments from Sterling Pharmacy to Wellington Rx | $11,815.07 |
| 43 | 01/31/2020 | Payment from Sterling Pharmacy to Wellington Rx | $8,048.81 |
| 44 | 02/11/2020 | Payments from Sterling Pharmacy to Wellington Rx | $22,397.13 |
| 45 | 03/03/2020 | Payments from Sterling Pharmacy to Wellington Rx | $14,774.22 |
| 46 | 03/13/2020 | Payments from Sterling Pharmacy to Wellington Rx | $26,048.84 |
| 47 | 03/25/2020 | Payments from Sterling Pharmacy to Wellington Rx | $9,477.90 |
| 48 | 04/03/2020 | Payment from Sterling Pharmacy to Wellington Rx | $18,736.00 |
| 49 | 05/11/2020 | Payment from Sterling Pharmacy to Wellington Rx | $16,380.98 |
| 50 | 05/13/2020 | Payments from Sterling Pharmacy to Wellington Rx | $13,199.01 |
| 51 | 07/15/2020 | Payments from Sterling Pharmacy to Wellington Rx | $12,877.21 |

All in violation of Title 42, United States Code, Sections 1320a-7b(b)(1) – (2) and Title 18, United States Code, Section 2.

THE GRAND JURY FURTHER CHARGES:

**COUNT 52**
18 U.S.C. § 371
(Conspiracy)

129. Paragraphs 1 through 46, 49 through 109, and 116 through 124 are incorporated here.

130. From about 2022 until about 2023, in Lackawanna County, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**FRANK SUESS,**
**VICTOR VELAZCO and**
**MELISSA DRISCOLL,**

did knowingly combine, conspire, confederate, and agree, with persons both known and unknown to the Grand Jury, to commit offenses against the United States and to defraud the United States, that is: To knowingly and willfully prevent, obstruct, mislead, delay and attempt to prevent, obstruct, mislead, and delay the communication of information and records relating to a violation of a federal health care offense to a criminal investigator, in violation of Title 18, United States Code, Section 1518;

To knowingly and willfully alter, destroy, mutilate, conceal, cover up, falsify, and make a false entry in any record, document, and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of any matter within the jurisdiction of any department or agency of the United States, in violation of Title 18, United States Code, Section 1519.

OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

131. On or about January 14, 2022, criminal investigators engaged in an investigation relating to a potential violation of a federal health care offense served a grand jury subpoena for records on MELISSA DRISCOLL. The grand jury subpoena, which was requested by the U.S. Attorney's Office for the Middle District of Pennsylvania, sought information and records from Sterling Pharmacy.

132. On or about January 14, 2022, ATTORNEY 1, then working at LAW FIRM 1, informed a criminal investigator via email that he represented Melissa Driscoll and Sterling Pharmacy in connection with the investigation.

133. ATTORNEY 1 worked at LAW FIRM 1 from at least 2020 to 2023. During this time period, ATTORNEY 1, through LAW FIRM 1, represented FRANK SUESS and MELISSA DRISCOLL simultaneously.

134. The grand jury subpoena for records served on Sterling Pharmacy sought several categories of documents, including "any and all communications, in any form, relating to drug classes commonly known as 'foot baths'"; "any and all agreements, in any form, relating to agreements between Sterling Pharmacy and any third parties relating to the supply, marketing, prescription, or dispensing of these drugs or drug classes"; "any and all records relating to arrangements with employees, contractors, or third parties for compensation or payment based on referrals of patients or physicians"; "any and all records relating to bills submitted to or requests for payment from any federal payors, including but not limited to Medicare"; and "any and all records relating to denied claims for payment or reimbursement from insurers."

135. On or about January 14, 2022, within hours of MELISSA DRISCOLL receiving the grand jury subpoena, VICTOR VELAZCO

sent an email to LUIS SALGADO and WARREN PIZIK, copying FRANK SUESS, asking for an update on "the agreement." VICTOR VELAZCO attached a draft "marketing services agreement" between Sterling Pharmacy and MedX. The draft agreement suggested that MedX, the "Contractor," would be paid $250 per hour for marketing services provided to Sterling Pharmacy and that MedX's compensation would "not be affected by the volume, or value, of business generated" by it. According to the draft agreement, MedX was supposed to track its hours devoted to marketing services and submit a monthly invoice to Sterling Pharmacy in order to receive compensation for its services. The agreement also suggested that MedX would comply with "all applicable federal and state laws, rules, and regulations," including the federal anti-kickback statute.

136. VICTOR VELAZCO also referenced "the payments we made" and attached check details showing the payments made between October 2019 and July 2020 to MedX and WARREN PIZIK.

137. FRANK SUESS and VICTOR VELAZCO had attempted on numerous occasions to get LUIS SALGADO and WARREN PIZIK to

sign a similar draft agreement, including on or about February 2020, April 2020, and November 2021. On or about February 2020, VICTOR VELAZCO referred to the draft agreement as "the contract our attorneys drafted up."

138. On or about November 30, 2021, LUIS SALGADO wrote to VICTOR VELAZCO, WARREN PIZIK, and FRANK SUESS, "I remember now why I didn't sign this agreement originally. The agreement was between coast to coast pharmacy and medx. Not sterling."

139. VICTOR VELAZCO then provided a second draft "marketing services agreement," this one purportedly between MedX and TEXAS PHARMACY. In response, LUIS SALGADO again complained that he entered into an agreement with CTC Pharmacy and "[n]o other pharmacy." VICTOR VELAZCO wrote that MedX "never did business with Coast to Coast . . . The prescriptions were filled through TEXAS PHARMACY and Sterling Pharmacy, therefore those are the pharmacies you worked with." LUIS SALGADO reiterated, "I never did a deal with them. The entire set up was with you and frank, coast to

coast. I went to your facility and made arrangements with you not any other pharmacy." In response, FRANK SUESS wrote, "Who did the payments come from?"

140. On or about February 3, 2022, ATTORNEY 1, on behalf of Sterling Pharmacy, furnished to a criminal investigator records responsive to the grand jury subpoena, including a signed version of the marketing services agreement between MedX and Sterling Pharmacy that FRANK SUESS and VICTOR VELAZCO had pressured LUIS SALGADO to sign. The agreement was backdated with an effective date of September 1, 2019, with no indication that it had just been signed. The signed version now specified an hourly rate of $240 per hour. The agreement contained signatures for both LUIS SALGADO and MELISSA DRISCOLL. It contained no reference to FRANK SUESS, VICTOR VELAZCO, or CTC Pharmacy.

141. ATTORNEY 1, on behalf of Sterling Pharmacy, furnished no email communications relating to foot baths in response to the grand jury subpoena for records. ATTORNEY 1, on behalf of Sterling

Pharmacy, furnished no records of any kind referring to FRANK SUESS, VICTOR VELAZCO, Wellington Rx, or CTC Pharmacy.

142. On or about March 1, 2022, a second grand jury subpoena for records relating to a potential violation of a federal health care offense was served on MELISSA DRISCOLL, this time through ATTORNEY 1. The grand jury subpoena sought information and records from Sterling Pharmacy, including "any and all documents relating to the marketing services agreement between Sterling Pharmacy and MedX dated September 1, 2019." The grand jury subpoena specifically requested the monthly invoices that MedX was supposed submit to Sterling Pharmacy in order to receive payment on an hourly basis.

143. In response, ATTORNEY 1, on behalf of Sterling Pharmacy, furnished to a criminal investigator backdated invoices that were fabricated in response to the grand jury subpoenas served on Sterling Pharmacy. These invoices claimed that MedX had provided 50 hours of services to Sterling Pharmacy every week from late August 2019 through late January 2020, for a total of $12,000 each week. Various unexplained "misc expense[s]" were added so that the figures would not

be identical for each week. The total sum amount of payments linked to these fabricated invoices was approximately $315,752.90.

144. These invoices inaccurately reflected the payments that Sterling Pharmacy in fact made to MedX. For instance, in reality, MedX was paid approximately $83,750.56 for its activities in "NY" for the time period of January 1 – 15, 2020.

145. On or about August 3, 2023, a grand jury subpoena for records in an investigation relating to a potential violation of a federal health care offense was served on Wellington Rx Inc, care of FRANK SUESS. The grand jury subpoena included numerous requests, including "any and all documents and communications" relating to CTC Pharmacy, TEXAS PHARMACY, LUIS SALGADO, WARREN PIZIK, VICTOR VELAZCO, and Sterling Pharmacy; "Any and all documents and communications relating to any agreement contemplated or reached between Sterling Pharmacy and MedX Marketing Solutions LLC"; and "any and all documents and communications, in any form, relating to drug classes commonly known as 'foot baths.'"

146. On or about August 23, 2023, FRANK SUESS sent an email to a criminal investigator including Wellington Rx's subpoena responses as an attachment. Among other things, FRANK SUESS claimed not to be able to "find any emails" relating to LUIS SALGADO and also wrote, "To the best of my knowledge, Wellington RX is not in possession of any documents or communication between Sterling Pharmacy and MedX Marketing," despite the fact that FRANK SUESS and VICTOR VELAZCO were the ones responsible for obtaining the signed marketing services agreement between MedX and Sterling Pharmacy.

147. FRANK SUESS, on behalf of Wellington Rx, furnished no email communications relating to foot baths in response to the grand jury subpoena for records. FRANK SUESS declared under penalty of perjury that he had caused a diligent search to be made for all records falling within the scope of the subpoena. FRANK SUESS declared under penalty of perjury that he had provided all of the records falling within the scope of the subpoena that were kept under his own custody and control or by other employees of Wellington Rx under his supervision and control.

All in violation of Title 18, United States Code, Section 371.

THE GRAND JURY FURTHER CHARGES:

**COUNT 53**
18 U.S.C. § 1518
(Obstruction of criminal investigations of health care offenses)

148. Paragraphs 1 through 46, 49 through 109, 116 through 124, and 131 to 147 are incorporated here.

149. On or about February 3, 2022, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**FRANK SUESS,**
**VICTOR VELAZCO and**
**MELISSA DRISCOLL,**

aiding and abetting one other and others known and unknown to the Grand Jury, did willfully prevent, obstruct, mislead, and delay the communication of information and records to a criminal investigator, and did attempt to do so, the information and records relating to fraudulent prescribing and billing for foot baths and kickback payments in connection with the same, a violation of a Federal health care offense, to a criminal investigator of the United States Attorney's Office

for the Middle District of Pennsylvania, a department of the United States to conduct or engage in investigations for prosecutions for violations of health care offenses.

All in violation of Title 18, United States Code, Sections 1518 and 2.

THE GRAND JURY FURTHER CHARGES:

**COUNT 54**
18 U.S.C. § 1519
(Destruction, alteration, or falsification of records in Federal investigations)

150. Paragraphs 1 through 46, 49 through 109, 116 through 124, and 131 to 147 are incorporated here.

151. On or about February 3, 2022, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**FRANK SUESS,**
**VICTOR VELAZCO and**
**MELISSA DRISCOLL,**

aiding and abetting one other and others known and unknown to the Grand Jury, did knowingly alter, destroy, mutilate, conceal, cover up, falsify, and make a false entry in the Sterling Pharmacy-MedX

Marketing Services Agreement, which was a record, document, and tangible object, with the intent to impede, obstruct, and influence the investigation and proper administration of a federal grand jury investigation, a matter that the defendants knew and contemplated was within the jurisdiction of the U.S. Attorney's Office for the Middle District of Pennsylvania, a department and agency of the United States.

All in violation of Title 18, United States Code, Sections 1519 and 2.

THE GRAND JURY FURTHER CHARGES:

**COUNT 55**
18 U.S.C. § 1519
(Destruction, alteration, or falsification of records in Federal investigations)

152. Paragraphs 1 through 46, 49 through 109, 116 through 124, and 131 to 147 are incorporated here.

153. On or about March 1, 2022, within the Middle District of Pennsylvania, and elsewhere, the defendants,

**FRANK SUESS,**
**VICTOR VELAZCO and**
**MELISSA DRISCOLL,**

aiding and abetting one other and others known and unknown to the Grand Jury, did knowingly alter, destroy, mutilate, conceal, cover up, falsify, and make a false entry in purported invoices from MedX to Sterling Pharmacy, which were records, documents, and tangible objects, with the intent to impede, obstruct, and influence the investigation and proper administration of a federal grand jury investigation, a matter that the defendants knew and contemplated was within the jurisdiction of the U.S. Attorney's Office for the Middle District of Pennsylvania, a department and agency of the United States.

All in violation of Title 18, United States Code, Sections 1519 and 2.

**THE GRAND JURY FINDS PROBABLE CAUSE:**

## FORFEITURE ALLEGATION

154. The allegations contained in Counts 1 through 55 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code,

Sections 981(a)(1)(C) and 982(a)(7), and Title 28, United States Code, 2461(c).

155. Upon conviction of an offense set forth in Counts 1 through 55 of this Indictment, the defendants,

**FRANK SUESS,**
**VICTOR VELAZCO**
**LUIS SALGADO,**
**DAVE SINGH,**
**DIANA CASTRO,**
**WARREN PIZIK, and**
**MELISSA DRISCOLL,**

shall forfeit to the United States pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7), and Title 28, United States Code, 2461(c), all property constituting, or derived from, proceeds obtained directly or indirectly as a result of the offenses; and, any and all property, real or personal, involved in such offenses, or any property traceable to such property. The property to be forfeited includes, but is not limited to, the following:

a. Approximately $1,361,619.95 million as a forfeiture money judgment;

b. A commercial property located at 3361 Fairlane Farms Rd, Wellington, FL 33414, more fully described as: "Lot 43 of COMMERCE PARK EAST, a P.I.P.D., according to the Plat thereof, as recorded in Plat Book 61, Page 95, of the Public Records of Palm Beach County, Florida"; and

c. Real property located at 1049 W. Ogden Ave, Unit 205, Naperville, IL 60563, more fully described as: "UNIT 1-205, TOGETHER WITH THE UNDIVIDED PERCENTAGE INTEREST IN THE COMMON ELEMENTS APPURTENANT TO SAID UNIT IN CRESS CREEK CONDOMINIUM IN PART OF LOT 31, IN BLOCK 16 IN CRESS CREEK, A SUBDIVISION OF PARTS OF SECTIONS 11, 12, AND 14, TOWNSHIP 38 NORTH, RANGE 9, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE DECLARATION OF CONDOMINIUM OWNERSHIP AND PLAT OF SURVEY ATTACHED

THERETO AS EXHIBIT "A", RECORDED ON JANUARY 25, 1979, AS DOCUMENT R79-007201, AS AMENDED FROM TIME TO TIME, IN DUPAGE COUNTY, ILLINOIS."

156. If any of the property described above, as a result of any act or omission of the Defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7), and Title 28, United States Code, 2461(c).

A TRUE BILL

[redacted]
FOREPERSON [redacted]

GERARD M. KARAM
United States Attorney

RAVI ROMEL SHARMA
Assistant United States Attorney

Date 11/13/2024